# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

**CIVIL ACTION NO. 3:12-CV-00005-M**

**ASHLEY SOUTHARD**                                               **PLAINTIFF**

**V.**

**DENNIS BELANGER,**
**LP MARTEN TRANSPORT, and**
**BLACK LAKE VENTURES, INC.**                              **DEFENDANTS**

#### Memorandum Opinion and Order

This matter is before the Court on the Defendants' Motion to Limit the Opinion Testimony of Robert Miller [DN 48] and their Motion to Exclude the Testimony of Sara Ford [DN 49]. This matter is also before the Court on three dispositive motions filed by the Defendants: (1) their Motion for Summary Judgment on the Plaintiff's Claim for Punitive Damages [DN 50]; (2) their Motion for Summary Judgment on All Claims against Defendant Martens Transport LLC [DN 51]; and (3) their Motion for Summary Judgment on the Plaintiff's Claim of Negligent Hiring, Training, or Supervision [DN 52]. This matter is also before the Court on the Plaintiff's Motion for Partial Summary Judgment [DN 54]. Fully briefed, this matter is ripe for decision.

## I. Background

This personal injury action arises from a motor vehicle accident which occurred on February 15, 2011. The undisputed evidence shows that the Plaintiff, Ashley Southard, merged from an interstate highway ramp onto Crittenden Drive in Louisville, Kentucky. She then struck the rear portion of a tractor-trailer before it completed a left turn at the intersection of Crittenden Drive and Boxley Avenue. The Plaintiff filed this action in state court, alleging motor vehicle negligence and gross negligence against the driver of the tractor-trailer, Dennis Belanger. She also brought

respondeat superior claims and negligent hiring, training, and supervision claims against Mr. Belanger's employer, Black Lake Ventures, and the owner of the tractor-trailer, Martens Transport. The Defendants removed the action to this Court on diversity grounds.

The parties have completed discovery and the deadline for filing dispositive motions, and motions related to the admissibility of expert testimony, has passed. (See Order [DN 36] 2.) The parties have filed various motions, which the Court will consider below.

## II. MOTIONS ON THE ADMISSIBILITY OF EXPERT TESTIMONY

The Defendants have filed two motions on the admissibility of expert testimony. One motion criticizes Robert Miller, an accident reconstruction analyst, who has been disclosed as an expert who may "provide testimony with respect to the categories of liability and damages, to the extent of the severity of the impact of the collision." (Expert Disclosure [DN 40] 2.) The other criticizes Sarah Ford, a vocational analyst, who has been disclosed as an expert who may "provide testimony with respect to the category of damages." (Id.) When analyzing motions on the admissibility of expert testimony, Fed. R. of Evid. 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, the judge acts as a gatekeeper to ensure that expert testimony is both reliable and relevant. Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 407 (6th Cir. 2006) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)). To determine whether testimony is reliable, the Court's focus "must be solely on principles and methodology, not on the conclusions

that they generate." <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 595 (1993).

In <u>Daubert</u>, the Supreme Court identified a non-exhaustive list of factors that may assist the Court in assessing the reliability of a proposed expert's opinion. These factors include: (1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique enjoys "general acceptance" in a "relevant scientific community." 509 U.S. at 592–94. This gatekeeping role is not limited to expert testimony based on scientific knowledge, but instead extends to "all 'scientific,' 'technical,' or 'other specialized' matters" within the scope of Rule 702. <u>Kumho Tire Co.</u>, 526 U.S. at 147.

Whether the Court applies the <u>Daubert</u> factors to assess the reliability of expert testimony "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." <u>Kumho Tire Co.</u>, 526 U.S. at 150 (quotation omitted). Any weakness in the underlying factual basis bears on the weight, as opposed to the admissibility, of the evidence. <u>*In re* Scrap Metal Antitrust Litig.</u>, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted).

**A. DEFENDANTS' MOTION TO LIMIT OPINION TESTIMONY OF ROBERT MILLER [DN 48]**

The Defendants have moved to limit the opinion testimony of Robert Miller. Mr. Miller is the sole proprietor of Crash Analysis & Reconstruction LLC, a professional collision reconstruction service. Prior to starting this sole proprietorship, Mr. Miller worked at Incorporated Reconstruction Services, LLC. (<u>See</u> Curriculum Vitae [DN 40-2] 1.) In the present case, Mr. Miller reviewed the documents generated through discovery and came to five conclusions: (1) Mr. Belanger turned left and failed to yield the right-of-way to oncoming traffic; (2) Mr. Belanger was distracted, inattentive, or failed to judge properly the approach speed of the Southard vehicle; (3) Mr. Belanger did not

allow enough time for his vehicle to cross three lanes of traffic safely; (4) Ms. Southard did not recognize the encroachment of the Belanger vehicle into her lane in time to avoid the collision; and (5) upon recognizing the encroaching vehicle into her travel path, Ms. Southard had insufficient time and distance to avoid colliding with the Belanger vehicle. (Expert Report [DN 40-2] 9.) The Defendants do not dispute that Mr. Miller is qualified to offer these opinions, as they are within the field of motor vehicle accident reconstruction. (See Mem. in Supp. of Defs.' Mot. [DN 48-1] 7.)

The Defendants, however, have filed a motion to exclude Mr. Miller's additional opinion that "using a cell phone while driving reduces a driver's situational awareness, decision-making, and/or performance while increasing response time." (Supp. Expert Disclosure [DN 43-1].) According to the Defendants, this "foray into the field of behavioral psychology" must be excluded because: (1) it is bolstered solely by Internet articles; and (2) it is "not a good fit with the facts" of this case. (See Mem. [DN 48-1] 7–8.) The Defendants also argue that Mr. Miller's opinion on the effects of cell phone usage must be excluded because it will not assist the trier of fact. For the following reasons, the Court agrees with the Defendants. Mr. Miller's opinion must be excluded.

The Defendants first argue that Mr. Miller is not qualified to offer an opinion on human factors, as doing so would be a "foray into the field of behavioral psychology." (Id.) In support of this argument, the Defendants quote a portion of Mr. Miller's deposition testimony, where he states:

> So I did some research on cell phone usage and driving while distracted and I have copies of those papers that I looked at and a couple of books that I referred to in regard to that issue.

(Robert Miller Dep. [DN 57-2] 18.) The Defendants then imply that Mr. Miller's opinion is based solely on "some research on cell phone usage" from the Internet. But as the Plaintiff correctly points out, the actual deposition testimony shows that Mr. Miller did not give this answer in response to

a question about the basis for his opinion. Instead, he was asked about the materials that were brought to the deposition. His response was descriptive of those materials. (See id. at 17–18.) Thus, the Court finds that this is not a basis for excluding Mr. Miller's testimony.

Indeed, contrary to the Defendants' suggestion, the Court finds that Mr. Miller is qualified on human factors as an accident reconstruction analyst. His qualification stems from his education and his experience. As to education, Mr. Miller has testified that human factors are a foundation of accident reconstruction. He has also testified that he received human factors training in many of the courses he has taken. (Id. at 15.) Thus, Mr. Miller has specialized knowledge on human factors, and this knowledge provides a foundation upon which he can testify. As to experience, the Court finds it significant that Mr. Miller has investigated or reconstructed over 1,600 motor vehicle crashes. The Court also finds it significant that Mr. Miller has extensive teaching experience, and experience from working with the Kentucky State Police. (Curriculum Vitae [DN 40-2].) This experience undoubtedly included human factors considerations. (See Robert Miller Dep. [DN 57-2] 15 (noting that human factors are "so interwoven with – with what we do").) Due to his education and experience, the Court concludes that Mr. Miller has the requisite specialized knowledge to testify on human factors.

However, having the requisite specialized knowledge to testify on human factors does not mean that Mr. Miller can offer **any** opinion on the matter. Instead, under Fed. R. of Evid. 702, Mr. Miller can only testify regarding human factors if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Thus, the Defendants argue that Mr. Miller's opinion on cell phone usage must be excluded because it will not assist the jury. According to the Defendants, Mr. Miller's opinion will not assist the jury since he has no specialized knowledge on the level of attention required to drive a motor vehicle while having a conversation

on a hands-free phone. (Mem. [DN 48-1] 11.) The Defendants contend that an accident reconstruction analyst is not required for a jury to know that using a cell phone while driving reduces a driver's situational awareness. Instead, the jurors' normal life experiences are sufficient to permit them to draw their own conclusions. The Court agrees. Mr. Miller's conclusion on cell phone usage will not assist the jury. Mr. Miller knows no more about this issue than does an average person.

Specifically, the Court finds that it must exclude Mr. Miller's opinion that using a cell phone while driving reduces a driver's situational awareness, decision-making, and/or performance while increasing response time. As the Supreme Court has noted,

> [E]xpert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge 'if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.'

Salem v. U.S. Lines Co., 370 U.S. 31, 35 (1962) (citation omitted). Here, after hearing the testimony of witnesses, the jurors will be able to comprehend that Mr. Belanger was using a hands-free device at the time of the accident. They will also be able to draw correct conclusions regarding this usage, and whether it increased the likelihood of the accident. Thus, as to this issue, Mr. Miller possesses no specialized knowledge. The jurors' own experiences permit them to draw their own conclusions.

The Court notes that while neither the Sixth Circuit nor any district courts in the Sixth Circuit have ruled on this issue, other district courts have done so and have reached similar conclusions. See, e.g., Haskins v. Helzberg, 2006 WL 6869428, at *3 (W.D. Mo. Feb. 17, 2006) (excluding testimony that cell phone use while driving causes physical and psychological changes which increase the risk of an accident since such testimony is "within the knowledge and experience of the

average lay person"). In the present case, as in <u>Haskins</u>, the question for the jury is not whether cell phone usage generally increases the likelihood of automobile collisions. <u>See id.</u> Instead, the question is whether Mr. Belanger failed to keep a careful lookout and/or failed to yield the right-of-way. The Defendants' motion to limit the opinion testimony of Mr. Miller is **GRANTED**.

## B. DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SARA FORD [DN 49]

The Defendants have moved to exclude the testimony of Sara Ford. Ms. Ford attended the University of Cincinnati, McMicken College of Arts and Sciences and received a Bachelor of Arts with Honors in Economics and Concentration in Labor Economics. She then obtained a Masters of Rehabilitation Counseling from the University of Kentucky. (Curriculum Vitae [DN 40-3].) Ms. Ford works as a vocational analyst for Vocational Economics, Inc. In this position, she provides assessments of lost earnings due to death, disability, or loss of employment. She is also a Certified Rehabilitation Counselor. (<u>See</u> Expert Report [DN 40-3].)

In this case, Ms. Ford interviewed the Plaintiff and reviewed various documents related to the Plaintiff's physical condition. She then projected the Plaintiff's loss of earning capacity. (<u>See id.</u>) The Defendants object to the introduction of this testimony on several grounds, including: (1) there is no factual basis for Ms. Ford's assumption regarding the Plaintiff's pre-injury earning capacity or any medical evidence supporting her assumption that the Plaintiff's ability to work in the future will be shortened by six years; (2) Ms. Ford did not use a reliable method to reach her opinions; (3) Ms. Ford did not conduct or review vocational testing; (4) as a person with "rehabilitation" qualifications, Ms. Ford is not qualified to conduct vocational assessments; and (5) Ms. Ford's expert disclosure was incomplete. (Defs.' Reply to Pl.'s Obj. [DN 58] 1–2.) The Plaintiff counters that Ms. Ford's testimony should not be excluded because it is both reliable and relevant.

The Court agrees with the Plaintiff.

**Factual Basis.** The Defendants first argue that there is no factual basis to support Ms. Ford's testimony. In this respect, the Defendants highlight that Ms. Ford did not review the Plaintiff's educational records or employment records before stating her conclusions. According to Defendants, if Ms. Ford had reviewed these records, she would have learned that the Plaintiff earned $5,563.33 the year before the accident and had withdrawn from college. (See Univ. of Louisville Transcript [DN 49-3]; Ignite Rest. Gp. Record [DN 49-4].) Further, the Defendants argue that if Ms. Ford had reviewed the Plaintiff's deposition transcript, she would have known that Plaintiff was unemployed and on home incarceration at the time of the accident. (See Ashley Southard Dep. [DN 49-5] 41.)

However, any weakness in the underlying factual basis of an expert's testimony bears on the weight, as opposed to the admissibility, of the evidence. *In re* Scrap Metal Antitrust Litig., 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted). Here, the Defendants' criticisms relate to the underlying factual basis. While the Defendants are free to bring out these criticisms on cross-examination, the Court finds that they are not grounds to exclude her testimony.

Ms. Ford's report shows that she considered the Plaintiff's age, anticipated education, and work-related limitations when creating her report, in combination with relevant population statistics. Ms. Ford has indicated that in so doing, she relied on her interview with the Plaintiff and her review of various documents related to the Plaintiff's physical condition. (See Expert Report [DN 40-3].) The Court finds that these considerations provide a sufficient factual basis to support Ms. Ford's opinions. The Court will not exclude these opinions simply because they are not based on Plaintiff's actual earnings at the time of her injury. See Boland-Maloney Lumber Co., Inc. v. Burnett, 302 S.W.3d 680, 689 (Ky. App. 2009) (noting that "it is not proper to confine the recovery to the

particular profession or occupation in which plaintiff may be engaged at the time of the injury").

**Reliable Method.** The Defendants next argue that Ms. Ford did not use a reliable method in this case. Their argument is two-fold. First, while the Defendants do not dispute the reliability of the survey data from the U.S. Census Bureau, they question Ms. Ford's "use of a one-size-fits-all table that distorts the Census Bureau's generalized polling data beyond recognition for the purpose of creating a commercially viable one-stop litigation service." (Defs.' Reply to Pl.'s Obj. [DN 58] 3.) According to the Defendants, Ms. Ford has simply relied on "inaccurate educational and earnings information" to plug "speculative and unsubstantiated dollar amounts" into a table. (Mem. in Supp. of Mot. to Exclude [DN 49-1] 8.) The Defendants argue that by doing so, Ms. Ford "could present virtually the same opinion testimony . . . in any courtroom, with any injured plaintiff, without modifying the opinion at all." See Phillips v. Indus. Mach., 597 N.W.2d 377, 382 (Neb. 1999). Second, the Defendants argue that Ms. Ford's testimony must be excluded since it is extensively based on self-serving essays which were prepared by the founders and corporate officers of her employer, Vocational Economics. The Court finds these criticisms to have no merit.

As to the Defendants' first argument, the Court finds that Ms. Ford's testimony should not be excluded due to her use of an allegedly "one-size-fits-all table." A cursory review of Ms. Ford's report reveals that this table merely summarizes her findings. Ms. Ford's conclusions within the table are specifically tailored to the Plaintiff, based on her age, anticipated education, and work-related limitations. (See Probability Analysis [DN 40-3].) Also, they are based on the U.S. Census Bureau's data, which the Defendants concede is reliable. Moreover, to the extent that the Defendants criticize Ms. Ford's use of a United States Life Table by noting that she "made an assumption that Plaintiff's working career would be 6.7 years shorter than it would have been if the accident had not

happened," (see Mem. in Supp. of Mot. to Exclude [DN 49-1] 3), the Court finds that the criticism fails. Courts have often found life tables to be a reasonable estimate of life expectancy, even while acknowledging that their predictions are not absolute. See, e.g., Knierim v. U.S. Gov't Dep't of Navy, 802 F. Supp. 2d 965, 972 (S.D. Ind. 2011) (citing cases). Indeed, other than Defendants' bald assertion, nothing indicates that the table in Ms. Ford's report is unreliable—or that it fails to accurately portray the U.S. Census Bureau's data.

As to the Defendants' second argument, the Court finds that Ms. Ford's testimony should not be excluded simply because it is based on essays prepared by the founders and corporate officers of her employer, Vocational Economics. In support of this argument, the Defendants rely on Kempf Contracting & Design, Inc. v. Holland-Tucker, 892 N.E.2d 672 (Ind. App. 2008). In that case, an Indiana state court excluded the opinion testimony of a vocational analyst, noting that he "did not name any peer-reviewed publication or provide any citation to authority that supported his bald assertion that his methodology to determine [the plaintiff's] lost future earnings was generally accepted in the field of vocational economics." Id. at 678. Here, however, Ms. Ford has cited several publications and authorities which support her conclusions. While some of these publications and authorities were written by the founders and corporate officers of Vocational Economics, it is clear that she has relied on several additional publications and authorities, including data from the Census Bureau.

**Vocational Testing.** Next, the Defendants criticize the fact that Ms. Ford did not conduct any vocational testing for the Plaintiff. According to the Defendants, without knowing the Plaintiff's specific vocational abilities, "it is pure guesswork to predict what she can and cannot do for the rest of her life." (Defs.' Reply [DN 58] 5.) The Defendants highlight Ms. Ford has described Plaintiff's

disability as a "mobility disability" despite the fact that people who have mobility disabilities range from those who are wheelchair-dependent to those who can walk unassisted despite having an ankle surgery the previous year. (Id.) But as Plaintiff correctly notes, Defendants overlook that Ms. Ford relied on medical evidence relating to Plaintiff's abilities and inabilities when making her opinions in this case. She also relied on an interview with the Plaintiff and the Plaintiff's discovery responses. (See Expert Report [DN 40-3].)

The Court notes that the Defendants have failed to cite any authority for the proposition that vocational assessments must be excluded when vocational testing has not been performed. Here, the Court finds that such a conclusion should not be reached. There are sufficient facts upon which Ms. Ford's opinions could be reasonably based.

**Qualifications to Offer Vocational Assessments.** Additionally, the Defendants argue that Ms. Ford's opinions on vocational assessment must be excluded since she only has "rehabilitation" qualifications, yet she purported to conduct a "vocational economic assessment." In support, the Defendants highlight that Ms. Ford does not meet the standards for a Vocational Assessment Professional. However, as the Plaintiff highlights, and as the Defendants concede, Ms. Ford does not claim to be a Vocational Assessment Professional. (See Defs.' Mem. [DN 49-1] 7.) Also, there are distinctions between Vocational Assessment Professionals and Certified Rehabilitation Counselors. (See Sara A. Ford Aff. [DN 56-1].) The Defendants have failed to cite any authority stating that Certified Rehabilitation Counselors are not permitted to conduct vocational economic assessments. Likewise, they have failed to cite any authority stating that vocational economic assessments by Certified Rehabilitation Counselors must be held to the standards applicable to Vocational Assessment Professionals. As such, the Court finds the Defendants' criticism to be

unwarranted.

**Disclosure of Bases of Opinions.** Finally, the Defendants argue that Ms. Ford's opinions should be excluded because the bases for her opinions were not fully disclosed in her expert report. This argument was raised in response to the Plaintiff's repeated comments that the Defendants did not take Ms. Ford's deposition in this action. The Court agrees with the Defendants that they were not required to take Ms. Ford's deposition in order to discover the reasons for her opinions. See R.C. Olmstead, Inc. v. CU Interface, LLC, 606 F.3d 262, 271 (6th Cir. 2010) (noting that an expert report "must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial" and "must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources"). However, the Court also finds that Ms. Ford's report was sufficiently complete, as it adequately outlined the reasons underlying her opinions. Therefore, this final criticism fails. The Defendants' motion to exclude Ms. Ford's testimony is **DENIED**.

### III. DISCUSSION OF DISPOSITIVE MOTIONS

Collectively, the parties have filed four summary judgment motions. Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving

party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

## A. DEFENDANTS' SUMMARY JUDGMENT MOTION ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES [DN 50]

In her complaint, the Plaintiff alleges that Defendant Belanger operated his tractor-trailer "in a negligent, grossly negligent, reckless and/or wanton manner." (Compl. [DN 1-2] ¶ 8.) Plaintiff's prayer for relief seeks punitive damages from all the Defendants. (Id. ¶ 2.) Defendants have moved for summary judgment on this punitive damages claim, contending that "no clear and convincing evidence exists to prove that Defendant Belanger's conduct in this ordinary motor vehicle collision reached the level of 'gross negligence.'" (Defs.' Mem. in Supp. of Summ. J. [DN 50-2] 2.) The Defendants also contend that the evidence does not support a punitive damages award from Black Lake Ventures, as the Plaintiff has not introduced evidence that Black Lake Ventures authorized or ratified any negligent conduct, or that Black Lake Ventures could have anticipated that an accident would happen. (Id.) In response, Plaintiff argues that she has presented sufficient evidence to survive Defendants' motion. For the following reasons, the Court agrees with Defendants.[1]

---

[1] The Court notes that the parties' arguments do not focus on the imposition of punitive damages against Defendant Martens Transport, LLC, despite the fact that a punitive damages claim is brought

Ky. Rev. Stat. § 411.184(2) states that a "plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." This clear and convincing standard can be met by producing evidence of a probative and substantial nature carrying sufficient weight to convince ordinarily prudent-minded people of its validity. See W.A. v. Cabinet for Health & Family Servs., 275 S.W.3d 214, 220 (Ky. App. 2008). The Sixth Circuit has held that "where the nonmoving party faces a heightened burden of proof, such as clear and convincing evidence, he must show in opposition to the motion for summary judgment that he can produce evidence which, if believed, will meet the higher standard." White v. Turfway Park Racing Ass'n, Inc., 909 F.2d 941, 944 (6th Cir. 1990), overruled on other grounds, Salve Regina College v. Russell, 499 U.S. 225 (1991) .

In Williams v. Wilson, the Kentucky Supreme Court found that the statute's requirement of "malice" is unconstitutional. 972 S.W.2d 260 (Ky. 1998). In so doing, it held that to impose punitive damages, conduct must amount to at least common-law "gross negligence." Id. In Horton v. Union Light, Heat & Power Co., the Kentucky Supreme Court explained this standard, noting that to justify punitive damages, "there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by 'wanton or reckless disregard for the lives, safety or property of others.'" 690 S.W.2d 382, 389–90 (Ky. 1985) (citation omitted).

**Defendant Belanger.** The Defendants argue that under these rules, punitive damages cannot be assessed against Mr. Belanger, as his conduct was at most ordinary negligence which led to a motor vehicle collision. In support, the Defendants cite Kinney v. Butcher, in which the Kentucky

---

against it. However, to the extent that the Defendants have moved for summary judgment on this issue, their motion is **GRANTED**. For the reasons set forth in the following section, the Court holds that summary judgment is appropriate on all claims against Martens Transport, LLC.

Court of Appeals declined to authorize punitive damages despite the fact that a driver was "traveling at a possible speed of ten miles per hour in excess of the posted speed limit" when he failed to complete a pass before entering a no-passing zone. 131 S.W.3d 357, 359 (Ky. App. 2004). In Kinney, the Court emphasized:

> Were we to accept Kinney's argument that [speeding and trying to pass in a no passing zone] amounts to wanton or reckless disregard for the safety of others, it would effectively eliminate the distinction between ordinary and gross negligence in the context of automobile accidents. Nearly all auto accidents are the result of negligent conduct, though few are sufficiently reckless as to amount to gross negligence, authorizing punitive damages. We are of the opinion that punitive damages should be reserved for truly gross negligence . . . .

Id. In this case, according to the Defendants, Mr. Belanger's allegedly negligent conduct of failing to yield right-of-way simply did not amount to wanton or reckless disregard for the safety of others.

The Plaintiff argues that Mr. Belanger's conduct did amount to wanton or reckless disregard for the safety of others because he was talking on a hands-free mobile device at the time of the accident despite his employer's policy against cell phone use. (See Dennis Belanger Dep. [DN 60-4] 44.) The policy, which was signed by Mr. Belanger, stated:

> **Distractions significantly affect the focus needed to safely operate a motor vehicle.** As professional drivers we need to ensure that we are focused on safely operating our vehicles and maintaining full concentration to our driving task.
>
> By limiting the use of cell phones (including texting and hands-free devices) to times when we are not operating a motor vehicle, we will reduce our exposure to accidents and/or injury.
>
> Cell phone use is only allowed in conjunction with a hands-free device and only in the following limited circumstance: Should a driver receive an incoming call while operating a Black Lake Ventures, Inc. owned/leased vehicle; if necessary he/she may briefly acknowledge the incoming call and inform the caller that he/she will call back once they have pulled over (when it is safe to do so), or once they have reached an authorized layover location and the vehicle is safely parked.

(Cell Phones, Texting & Driving Policy [DN 60-2].) According to the Plaintiff, Mr. Belanger was

15

flagrantly indifferent to her rights because he initiated the phone call and maintained it while driving the tractor-trailer, in direct violation of the policy. Further, the Plaintiff highlights that for the date of the accident and the five previous working days, Mr. Belanger dialed fifty-nine phone calls and received an additional sixteen calls during times he indicated he was driving. (See Travel Log [DN 60-1]; Sprint Records [DN 60-3].) The Plaintiff suggests that this pattern of conduct by a "professional driver" evidences Mr. Belanger's flagrant indifference to her rights.

The Court, however, agrees with the Defendants. Under Kentucky law, punitive damages are reserved for conduct that truly constitutes gross negligence. For example, Kentucky courts have found that punitive damages are warranted when a driver is intoxicated. See, e.g., Shortridge v. Rice, 929 S.W.2d 194, 198 (Ky. App. 1996). They have also found that punitive damages are warranted when there are several instances, or egregious instances, of misconduct. See Phelps v. Louisville Water Co., 103 S.W.3d 46, 52 (Ky. 2003) (noting that a jury could find gross negligence when there were eighteen instances of misconduct, including several misrepresentations, violations of the company's internal policies and standards, failures to notify the proper entities, and improper conduct at the work zone); see also Gersh v. Bowman, 239 S.W.3d 567, 572 (Ky. App. 2007) (noting that a jury could find gross negligence when the driver was traveling at least twenty-four miles per hour over the speed limit for the road, and at least thirty-four miles per hour more than the speed limit for the curve, with two passengers in his vehicle, when it was dark outside, and when the driver's passenger warned the driver of the upcoming curve in the road and the driver said "yeah, I got it"). The facts here simply do not rise to such a level.

Indeed, the Court concludes that a finding of gross negligence in this case would effectively eliminate the distinction between ordinary and gross negligence. Mr. Belanger's alleged misconduct

of driving while using a hands-free cell phone in violation of company policy, but within the speed limit, apparently in the proper lane, without any suggestion of intoxication, and without a prior history of automobile accidents, does not match the level of culpability in the cases where punitive damages were available. As the Defendants highlight, the investigating police officer found no evidence of gross negligence. (Charles Bright Dep. [DN 50-3] 23.) Also, the Plaintiff's accident reconstruction analyst, Robert Miller, did not reach any conclusions which support a claim of gross negligence. (Expert Report [DN 40-2].) The Plaintiff's opinion that Mr. Belanger "[s]hould have been paying attention if you're driving a vehicle that size," (Ashley Southard Dep. [DN 50-5] 80–81), does not elevate Mr. Belanger's conduct to the level required for the imposition of punitive damages.

As the parties note, Kentucky courts have not expressly considered the issue of whether using a hands-free cell phone in violation of company policy can give rise to a gross negligence claim. But the Kentucky Court of Appeals has held that an intentional violation of transportation regulations by a truck driver does not justify punitive damages. See Horn v. Hancock, 700 S.W.2d 419, 421 (Ky. App. 1985), *overruled on other grounds*, Cooper v. Fultz, 812 S.W.2d 497 (Ky. 1991). The Court finds that based on this holding, it is likely that Kentucky courts would hold that an intentional violation of a company policy, without more, does not justify punitive damages.

This conclusion is supported by other district court decisions that were decided under Kentucky law. For example, in Turner v. Werner Enters., Inc., Judge Hood held that knowingly driving while sleepy and causing a crash after falling asleep does not meet the standard of gross negligence. 442 F. Supp. 2d 384, 386–87 (E.D. Ky. 2006). It seems to the Court that a similar conclusion would be warranted here. Talking on a hands-free mobile device seems less serious or egregious—or, at most, as serious or egregious—than knowingly driving while sleepy, which was

17

found not to meet the gross negligence standard. The Court finds that the conduct in this case also does not meet the gross negligence standard, especially because using a hands-free device while driving is not prohibited by Kentucky law. See Ky. Rev. Stat. § 189.292(2) (noting that the use of a cell phone is permitted unless the device is being used to send a text message or e-mail).

Finally, the Court notes that in the Plaintiff's response, she continually highlights that Mr. Belanger was a "professional driver," indicating that this fact somehow heightens the egregiousness of his conduct. In so doing, she implies that the standard of care for a tractor-trailer driver differs from the standard of care for any other motor vehicle driver on the highway. Kentucky law is clear, however, that all motor vehicle drivers, with the exception of those who carry passengers for hire, are held to the same standard of care, regardless of the type or size of their vehicle. See Dixie Ohio Exp. Co. v. Vickery, 206 S.W.2d 821, 823 (Ky. 1947). Thus, to the extent that the Plaintiff argues that Mr. Belanger's conduct was more egregious due to the nature of his job, her argument is without merit. The Court finds that Mr. Belanger's conduct, at most, constitutes ordinary negligence. The Defendants' motion is **GRANTED** with respect to the punitive damages claim against Mr. Belanger.

**Defendant Black Lake Ventures.** Next, the Defendants rely on Ky. Rev. Stat. § 411.184(3) to move for summary judgment on Plaintiff's punitive damages claim against Black Lake Ventures. In support, the Defendants argue that under the statutory language, punitive damages are not justified against Black Lake Ventures because it could not have anticipated that an accident would happen due to Mr. Belanger's phone use, and because no one authorized or ratified any negligent conduct.

Ky. Rev. Stat. § 411.184(3) expressly limits the imposition of punitive damages against an employer for the negligence of its employee. It provides:

> In no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question.

Id. To satisfy these requirements, it is incumbent upon the Plaintiff to introduce evidence that one or more of Black Lake Ventures' representatives "authorized or ratified or should have anticipated" Mr. Belanger's acts. See Carter v. Builders Transp., Inc., 812 F. Supp. 97, 99 (W.D. Ky. 1992) (holding that punitive damages could not be assessed against the truck driver's employer because nothing indicated that the employer "in anyway authorized, ratified, or should have anticipated the complained of behavior"); see also Turner, 442 F. Supp. 2d at 387 (reaching the same conclusion).

The Plaintiff argues that Black Lake Ventures should have anticipated that Mr. Belanger's cell phone usage while driving would lead to the accident in question. In support, the Plaintiff argues that Black Lake Ventures should have been aware that Mr. Belanger breached the company's cell phone policy due to Mr. Belanger's travel logs and cell phone records, and due to the fact that Black Lake Ventures' representatives encouraged and participated in the dangerous behavior by speaking with Mr. Belanger on his phone when he was operating his vehicle. (See Pl.'s Resp. [DN 60] 12–14.) As an example of this encouragement and participation, the Plaintiff notes that a few hours after the subject accident, Mr. Belanger called Mark Neumann, the manager of Black Lake Ventures, and spoke to him for 201 seconds while he was driving. (See Travel Log [DN 60-1]; Sprint Records [DN 60-3].) Plaintiff proposes that this conduct justifies punitive damages against Black Lake Ventures.

In McGonigle v. Whitehawk, Judge Russell discussed the imposition of punitive damages against an employer. 481 F. Supp. 2d 835, 841 (W.D. Ky. 2007). In so doing, he noted that for the plaintiffs to recover punitive damages against the employer, they had to demonstrate "that not only

did [the employee] act grossly negligent during the scope and course of his employment . . . but also that [the employer] either authorized or should have anticipated [the employee's] wrongful conduct." Id. Judge Russell went on to deny a punitive damages claim against an employer after its allegedly intoxicated employee rammed into the rear of a motorists' vehicle, despite the fact that the employer knew that its employee had two prior convictions for driving under the influence. Id. at 841–42. In so doing, he noted that these instances had occurred six and one half years prior to the incident. He also noted that these instances did not qualify as an inappropriate pattern of conduct. Id.

Here, the Court likewise concludes that despite the fact that Black Lake Ventures might have known that Mr. Belanger used a hands-free device while driving, in violation of the company policy, there is no evidence that Black Lake Ventures should have anticipated that Mr. Belanger's cell phone usage would lead to the accident in question. Indeed, Mr. Belanger had never had an accident before during his employment with Black Lake Ventures, let alone one that was caused by cell phone usage. Further, Mr. Belanger testified he had not been involved in a collision with another vehicle since 1978—and he had never been involved in a collision while driving a tractor-trailer, despite a couple of instances with deer. (See Dennis Belanger Dep. [DN 52-3] 51.) The Court finds that due to these facts, the imposition of punitive damages on Black Lake Ventures would be improper. With respect to Mr. Belanger, there is simply no pattern of dangerous driving while using a hands-free mobile device. Therefore, Black Lake Ventures could not have anticipated such a pattern. The Defendants' summary judgment motion is **GRANTED** as to Black Lake Ventures.

### B. DEFENDANTS' SUMMARY JUDGMENT MOTION ON ALL CLAIMS AGAINST DEFENDANT MARTENS TRANSPORT, LLC [DN 51]

In her complaint, the Plaintiff alleges that Defendant Dennis Belanger was the "servant and/or agent" of Defendant Martens Transport, LLC, which is identified as "LP Marten Transport" in the case

heading of this action. The Plaintiff also alleges that Martens Transport "may have contributed to or caused Plaintiff's damages by negligently hiring, training, and/or supervising Belanger . . . ." (See Compl. [DN 1-2] ¶¶ 7, 13.) The Defendants have moved for summary judgment on all claims against Martens Transport. In support, they argue that Mr. Belanger was not Martens Transport's servant, agent, or employee and that it should not be a party to this action. The Court agrees.

**Respondeat Superior.** Under Kentucky law, an employer is jointly and severally liable for the negligence of any employee who is acting within the course and scope of employment at the time of the negligence. Bowen v. Gradison Constr. Co., 6 S.W.2d 481, 482–83 (Ky. 1928). A master-servant relationship must be proven and mere ownership of a vehicle that is involved in an accident is not sufficient to impose vicarious liability. Packard-Louisville Motor Co. v. O'Neal, 58 S.W.2d 630, 631 (Ky. 1933); Taulbee v. Mullins, 336 S.W.2d 597, 598 (Ky. 1960). In other words, "[m]ere ownership of an automobile is not enough to impose liability on the owner for an accident brought about by the negligence of one operating the car . . . ." Farmer v. Stidham, 439 S.W.2d 71, 72 (Ky. 1969).

As the Defendants note, the uncontroverted evidence establishes that Mr. Belanger was not Martens Transport's servant, agent, or employee. (See Belanger Dep. [DN 51-3] 25; see also Resp. to Interrogs. [DN 51-4] 16.) While Plaintiff argues that Mr. Belanger was Martens Transport's agent at the time of the accident, the Court finds that this argument fails. Under Kentucky law, an agency "is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." CSX Transp., Inc. v. First Nat'l Bank, 14 S.W.3d 563, 566 (Ky. App. 1999) (citation omitted).

In support of her argument that Mr. Belanger was Martens Transport's agent, the Plaintiff characterizes the lease between Martens Transport and Mr. Belanger as "extremely controlling,"

arguing that Martens Transport carried "a much larger role than the lessor of equipment." (Pl.'s Resp. [DN 61] 5.) Specifically, Plaintiff cites portions of the parties' lease which state that Martens Transport had a right to attach a tracking device to the vehicle, inspect the equipment without prior notice, provide all maintenance on the equipment, and cancel the lease at any time. The Plaintiff also notes that the lease provided for Martens Transport to be paid a certain percentage of the freight charges earned through the use of the tractor-trailer. (Id. at 5–7.) Further, according to Plaintiff, there is evidence that Martens Transport "managed the day to day operations of Defendant Belanger's hauls" since Mr. Belanger checked in with Kevin Martens, the owner of Martens Transport, almost daily to discuss job issues. (Id. at 7.)

But the Court finds that despite the Plaintiff's characterization of the lease as "extremely controlling," a review shows that it is very standard, giving Martens Transport **no** control over Mr. Belanger's hauls and **no** say in his day-to-day operations. (See Lease Agreement [DN 61-3].) The Court finds that the lease leaves all aspects of controlling and operating the truck to Mr. Belanger and Black Lake Ventures. (See Contractor Op. Agreement [DN 65-1] (vesting control over the day-to-day operations of the vehicle in Black Lake Ventures).) The lease's language clearly delineates that Martens Transport is nothing more than a vehicle lessor. There is no evidence, in the lease or otherwise, that Martens Transport or Mr. Belanger agreed that one would act on behalf of the other.

Instead, the lease simply sets out common limitations regarding the permitted uses of the leased vehicle. Martens Transport retained an interest only in the well-being of the equipment and the end result of getting paid rent for the leased vehicle. (Lease Agreement [DN 51-7] ¶ 4.) Martens Transport had no power or responsibility to control the method, manner, or details of Mr. Belanger's work. Therefore, there was no agency. See Nazar v. Branham, 291 S.W.3d 599, 606–07 (Ky. 2009)

(noting that a person "is the agent of another if the principal has the power or responsibility to control the method, manner, and details of the agent's work").

The Court finds that based on these facts, it is clear that Mr. Belanger simply leased a tractor-trailer from Martens Transport. He was driving it under the authority of Black Lake Ventures on the day that the accident with the Plaintiff occurred. (See Belanger Dep. [DN 51-3] 14, 19, 25, 27.) Thus, it is clear that no liability can be imparted to Martens Transport under any set of facts under a respondeat superior theory. Martens Transport's only involvement was owning one of the vehicles which was involved in the accident. Under Kentucky law, as noted above, the fact that Martens Transport owned the vehicle does not support a claim of vicarious liability against it. The Plaintiff's respondeat superior theory of liability against Martens Transport fails.

**Negligent Hiring, Training, or Supervision.** In Oakley v. Flor-Shin, Inc., Kentucky's Court of Appeals held that "an employer can be held liable when its failure to exercise ordinary care in hiring or retaining an employee creates a foreseeable risk of harm to a third person." 964 S.W.2d 438, 442 (Ky. App. 1998). The threshold issue of a negligent hiring, training, or supervision claim is whether the accused tortfeasor was actually an employee of the named defendant. See id. Again, Mr. Belanger was not Martens Transport's employee, or its servant or agent. The Plaintiff's negligent hiring, training, or supervision theory of liability against Martens Transport fails. The Defendants' summary judgment motion is **GRANTED**.

The Court notes that in response to the Defendants' summary judgment motion, the Plaintiff also argues that Mr. Belanger was engaged as a partner in a joint venture with Martens Transport at the time of the accident. Under Kentucky law, a joint venture is defined as an informal partnership for a limited purpose and duration. See Manning v. Owens, 125 S.W.2d 753, 755–56 (Ky. 1939);

Jones v. Nickell, 179 S.W.2d 195, 196 (Ky. 1944). According to the Plaintiff, Mr. Belanger was engaged in a joint venture with Martens Transport at the time of the accident. In support of this argument, the Plaintiff reiterates her belief that Martens Transport "acted in all manners of control over the job performed by Defendant Belanger." (Pl.'s Resp. [DN 61] 5.) Again, however, the Court finds that the extent of Martens Transport's control was limited: first to the safekeeping of its equipment; and second to the payment of the lease amounts. (See Lease Agreement [DN 51-7].)

The Plaintiff's argument that a lease agreement can create a joint venture was rejected years ago in Burbank v. Sinclair Prairie Oil Co., 202 S.W.2d 420, 422 (Ky. 1946). In that case, the court held "that the leasehold does not, nor does the manner of operation constitute a joint enterprise." Id. According to the court, while there may be a joint interest in proceeds under a lease, "as to operation and management the lessor has no say . . . . To create the relationship there must be a combination of money, efforts, skill or knowledge in some common undertaking; a joint control; a sharing of profits or losses." Id. Here, it is unclear what "common undertaking" the Plaintiff believes that Mr. Belanger and Martens Transport undertook—and Plaintiff has pointed to no evidence of joint control or sharing of profits or losses. Therefore, there was no joint venture.

### C. Defendants' Summary Judgment Motion on Plaintiff's Claim of Negligent Hiring, Training or Supervision [DN 52]

The Defendants next move for summary judgment on the Plaintiff's claim of negligent hiring, training, or supervision against Black Lake Ventures. As previously discussed, in Oakley v. Flor-Shin, Inc., Kentucky's Court of Appeals held that "an employer can be held liable when its failure to exercise ordinary care in hiring or retaining an employee creates a foreseeable risk of harm to a third person." 964 S.W.2d 438, 442 (Ky. App. 1998). In this case, the Defendants argue that summary judgment is appropriate because the uncontroverted evidence shows that Mr. Belanger was

well-trained and experienced, had an excellent driving record, and was qualified to operate the tractor-trailer. The Defendants propose that due to this evidence, Plaintiff cannot show that the accident was foreseeable to Black Lake Ventures. See Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell, 736 S.W.2d 328, 332 (Ky. 1987), *superseded by statute*, Ky. Rev. Stat. § 413.241 (noting the general rule that "every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury").

The Plaintiff concedes that "there is no evidence that Belanger should not have been hired." (Pl.'s Resp. [DN 59] 10.) Thus, the Defendants' summary judgment motion is **GRANTED** as to the Plaintiff's negligent hiring claim. However, the Plaintiff maintains that she has presented sufficient evidence for her negligent training and supervision claim to survive this summary judgment motion. The Plaintiff's negligent training argument seems to be based on the idea that the Defendants failed to prepare Mr. Belanger for the "known hazards of distracted driving" since the only training given involved a single initial road test and the distribution of a driving policy handbook. (Id. at 9). The Plaintiff's negligent supervision argument seems to be based on the idea that Black Lake Ventures' management knew that Mr. Belanger was using his cell phone while driving, and further knew that such usage was dangerous (as evidenced by their policy, which restricted even the hands-free usage of cell phones), yet failed to take remedial or disciplinary actions against him. (Id. at 7–8.) The Court agrees with Defendants that Plaintiff's negligent training and supervision claim must be dismissed.

In the instant case, it is undisputed that Black Lake Ventures has admitted respondeat superior liability. While Kentucky courts have not specifically addressed whether negligent training and supervision claims survive in light of an admission of respondeat superior liability, several courts have done so and have concluded that they do not. Judge Forester explained this issue in Oaks

v. Wiley Sanders Truck Lines, Inc., 2008 WL 5459136, at *1 (E.D. Ky. Nov. 10, 2008):

> Under the doctrine of respondeat superior, an employer may be held vicariously liable for the tortious conduct of an employee if the evidence shows that such conduct was committed while the employee was acting within the scope of his employment. The majority rule is that once an employer has admitted respondeat superior liability for a driver's negligence, it is improper to allow a plaintiff to proceed against an employer on any other theory of imputed negligence. Scroggins v. Yellow Freight Sys., Inc., 98 F. Supp. 2d 928, 931 fn.3 (E.D. Tenn.2000) (applying Georgia law). Once an employer defendant has admitted liability to plaintiff for its employee's negligence, the evidence laboriously submitted to establish the other theory of liability serves no purpose. The energy and time of courts and litigants is unnecessarily expanded. In addition, potentially inflammatory evidence comes into the record which is irrelevant to any contested issue in the case. Once vicarious liability for negligence is admitted under respondeat superior, the person to whom the negligence is imputed becomes strictly liable to the third party for damages attributable to the conduct of the person from whom negligence is imputed. The liability of the employer is fixed by the amount of liability of the employee.
>
> Here, we have a case where the employer has admitted respondeat superior liability so presentation of evidence to support the negligent hiring, training, retention, supervision and entrustment claims is unnecessary. Allowing the claim for negligent hiring, training, retention, supervision and entrustment to continue would not entitle Plaintiff to greater recovery but would merely prejudice Wiley Sanders. There is an exception to this rule when punitive damages are contested, but no claim for punitive damages exists here, making this exception irrelevant.

Id. Many other courts have reached similar conclusions. See, e.g., McHaffie v. Bunch, 891 S.W.2d 822, 826 (Mo. 1995) (citing cases); Gant v. L.U. Transp., Inc., 770 N.E.2d 1155, 1160 (Ill. App. 2002); Lee v. J.B. Hunt Transp., Inc., 308 F. Supp. 2d 310, 313 (S.D.N.Y. 2004); Hackett v. Wash. Metro. Area Transit Authority, 736 F. Supp. 8, 9 (D.D.C. 1990).

The Court agrees with these decisions. Therefore, it finds that because Black Lake Ventures has admitted respondeat superior liability, the presentation of evidence to support the negligent training and supervision claim is unnecessary. The Defendants' summary judgment motion on this claim is **GRANTED**. As the Defendants note, allowing the negligent training and supervision claim

to proceed would serve no purpose other than prejudicing Black Lake Ventures. (<u>See</u> Defs.' Reply [DN 66] 5.) While the Court notes that there is an exception when a plaintiff has a valid claim for punitive damages against an employer, the Court has previously determined that there is no such valid claim here.

### D. PLAINTIFF'S PARTIAL SUMMARY JUDGMENT MOTION [DN 54]

The Plaintiff argues that she is entitled to partial summary judgment in this case because Mr. Belanger was negligent as a matter of law. In support, she claims that Mr. Belanger's failure to yield the right-of-way constitutes a *prima facie* case of negligence per se. Ky. Rev. Stat. § 189.330(9), the statute on which the Plaintiff relies, states as follows:

> The operator of a vehicle intending to turn to the left within an intersection or into an alley, private road, or driveway shall yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard.

Ky. Rev. Stat. § 189.330(9). The Plaintiff argues that the evidence clearly shows that Mr. Belanger began his turn when the Plaintiff's car was so close as to constitute an immediate hazard. Therefore, Mr. Belanger did not yield the right-of-way and was negligent as a matter of law.

The Plaintiff relies on <u>Chambliss v. Lewis</u> in support of her argument. 382 S.W.2d 207, 209 (Ky. 1964). In that case, the court found that the defendant was negligent as a matter of law when he collided with an approaching car that was "in view for an unlimited distance." <u>Id.</u> According to the court, when the defendant proceeded across the highway without stopping, he clearly "assumed the risk in trying to cross the highway knowing that a collision could result." <u>Id.</u> at 208–209. Further, despite the fact that the defendant "thought that he had time to cross the road," the court found that a directed verdict was proper since "the speed of the approaching car cannot be considered to be a causative factor." <u>Id.</u> The court's conclusion was based, in part, on testimony of three disinterested

witnesses who saw the defendant proceed across the highway without stopping. Id.

As the Defendants correctly note, however, the Kentucky Supreme Court has distinguished the facts of Chambliss from cases with facts similar to this one. For example, in Metcalfe v. Hopper, 400 S.W.2d 531, 534 (Ky. 1966), the Court held that the issue of whether the approaching vehicle is close enough "to constitute an 'immediate hazard' is **the critical question** when examining the negligence of the [other driver]." (Emphasis added). Likewise, in Browning v. Callison, 437 S.W.2d 941, 944 (Ky. 1969), the Court found that the situation was "not so one-sided . . . as to furnish the grounds for a directed verdict . . . ." Id. In so doing, it distinguished Chambliss, noting that in that case, the undisputed evidence proved that the defendant pulled in front of the plaintiff's vehicle "too late for the latter to avoid the collision."

In this case, the Defendants have produced evidence that the Plaintiff had an opportunity to avoid the collision and, thus, did not constitute an immediate hazard. (See Robert Miller Dep. [DN 55-3] 85 (testifying that a reasonable person exercising ordinary care in Plaintiff's position should have recognized that there was a tractor-trailer in her path in time to slow down and avoid the collision).) Further, there is evidence that at least 10.7 seconds elapsed before the Plaintiff struck Mr. Belanger's tractor-trailer. (See Lou Inendino Report [DN 55-2] 1.) As such, whether Mr. Belanger pulled in front of Plaintiff's vehicle too late for her to avoid the collision is disputed. This evidence is sufficient to allow the jury to consider whether Mr. Belanger complied with the standard of care outlined in Ky. Rev. Stat. § 189.330(9). The facts of this case are distinguishable from those in Chambliss. The jury should be permitted to determine whether Plaintiff's vehicle was "within the intersection or so close thereto as to constitute an immediate hazard" at the time that Mr. Belanger began turning. A genuine issue of material fact exists. Plaintiff's motion is **DENIED**.

Additionally, the Court finds that there are other genuine issues of material fact precluding the entry of summary judgment. As the Defendants correctly note, a "violation of a statute does not necessarily create liability." Hargis v. Baize, 168 S.W.3d 36, 46 (Ky. 2005). Indeed, negligence per se does not create liability; instead, it simply substitutes statutory requirements for the common-law standard of care. The Kentucky Court of Appeals clarified this in Stivers v. Ellington, when it stated:

> At common law, the standard of care was a question of law for the court and, generally, was that of a reasonably prudent person. With negligence per se, the standard of care is legislatively declared by statute and a jury only determines whether the specified act prohibited or required by statute was committed. As with common-law negligence, causation and injury must still be proved in negligence per se claims.

140 S.W.3d 599, 601 (Ky. App. 2004) (internal citations omitted). In this case, the Plaintiff broadly states that Mr. Belanger's failure to yield the right-of-way was the "proximate cause of the accident." (Pl.'s Mem. [DN 54-1] 3.) However, evidence contrary to this statement is available. For example, the Defendants' accident reconstruction expert has made conclusions which suggest that Plaintiff's failure to pay attention was the accident's cause. (See Lou Inendino Report [DN 55-2] 1–2.) In sum, the Court finds that the Plaintiff has the "burden of showing conclusively that no genuine issue of material fact exists." 60 Ivy St. Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir. 1987). Here, she has not met this burden.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the Defendants' Motion to Limit the Opinion Testimony of Robert Miller [DN 48] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Defendants' Motion to Exclude the Testimony of Sara Ford [DN 49] is **DENIED**.

**FURTHER** that the Defendants' Motion for Summary Judgment on the Plaintiff's Claim

for Punitive Damages [DN 50] is **GRANTED**.

FURTHER that the Defendants' Motion for Summary Judgment on All Claims against Defendant Martens Transport LLC [DN 51] is **GRANTED**.

FURTHER that the Defendants' Motion for Summary Judgment on Plaintiff's Claim of Negligent Hiring, Training, or Supervision [DN 52] is **GRANTED**.

FURTHER that the Plaintiff's Motion for Partial Summary Judgment [DN 54] is **DENIED**.

cc: counsel of record